# United States Court of Appeals
## For the First Circuit

No. 15-2364

DOMINIC OLIVEIRA,
on his behalf and on behalf of all others similarly situated,

Plaintiff, Appellee,

v.

NEW PRIME, INC.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Thompson and Kayatta, Circuit Judges,
and Barbadoro,* District Judge.

Theodore J. Boutrous, Jr., with whom Joshua S. Lipshutz, Jason C. Schwartz, Thomas M. Johnson, Jr., Lindsay S. See, Gibson, Dunn & Crutcher LLP, William E. Quirk, James C. Sullivan, Robert J. Hingula, Polsinelli PC, Judith A. Leggett, and Leggett Law Firm, P.C. were on brief, for appellant.
Jennifer D. Bennett, with whom Public Justice, P.C., Hillary Schwab, Fair Work, P.C., Andrew Schmidt, and Andrew Schmidt Law, PLLC were on brief, for appellee.
Richard Frankel on brief for amicus curiae in support of appellee.

_____
* Of the District of New Hampshire, sitting by designation.

May 12, 2017

**THOMPSON**, **Circuit Judge**.  This case raises two questions of first impression in this circuit.  First, when a federal district court is confronted with a motion to compel arbitration under the Federal Arbitration Act (FAA or Act), 9 U.S.C. §§ 1-16, in a case where the parties have delegated questions of arbitrability to the arbitrator, must the court first determine whether the FAA applies or must it grant the motion and let the arbitrator determine the applicability of the Act?  We hold that the applicability of the FAA is a threshold question for the court to determine before compelling arbitration under the Act.  Second, we must decide whether a provision of the FAA that exempts contracts of employment of transportation workers from the Act's coverage, see id. § 1 (the § 1 exemption), applies to a transportation-worker agreement that establishes or purports to establish an independent-contractor relationship.  We answer this question in the affirmative.  Accordingly, we affirm the district court's order denying the motion to compel arbitration and dismiss this appeal for lack of appellate jurisdiction.

### Background[1]

The defendant, New Prime, Inc. (Prime), operates an interstate trucking company.  Under its Student Truck Driver

_____

[1] Because the motion to compel arbitration was made in connection with a motion to dismiss or stay, we glean the relevant facts from the operative complaint and the documents submitted to

- 3 -

Program (apprenticeship program), Prime recruits and trains new drivers. Prime touts its program as offering "[p]aid [a]pprenticeship [Commercial Driver's License (CDL)] [t]raining." After attending a four-day orientation, student drivers hit the road with a Prime truck driver, who acts as an on-the-job instructor. In this phase of the apprenticeship program, student drivers must log 10,000 miles as a driver or passenger, and, apart from an advance of $200 per week for food (which eventually must be repaid), the apprentices are not paid.[2] After completing the supervised-driving period, the student driver takes the examination for a CDL and then must drive 30,000 more miles as a B2 company driver trainee (B2 trainee). Prime pays its B2 trainees fourteen cents per mile. At the conclusion of the B2 trainee portion of the apprenticeship program, the apprentices attend

---

the district court in support of the motion. See Gove v. Career Sys. Dev. Corp., 689 F.3d 1, 2 (1st Cir. 2012).

[2] This arrangement allows Prime to transport its shipments in a more economical and efficient manner. Under United States Department of Transportation regulations, a truck driver's "[o]n-duty time" includes "[a]ll driving time" as well as a host of other non-driving tasks, including time spent supervising a student driver who is behind the wheel. 49 C.F.R. § 395.2. In any fourteen-hour period of on-duty time, a truck driver has only eleven hours of driving time. Id. § 395.3(a)(2)-(3)(i). After a Prime instructor driver has maxed out his or her eleven hours of driving time, the instructor driver still has three more hours of on-duty time remaining. Thus, once an instructor driver has exhausted his or her own driving time, a student driver can drive the truck toward its ultimate destination for up to three more hours, and Prime does not pay the student driver for this bonus driving time.

additional orientation classes for approximately one week. Apprentices are not paid for time spent in this orientation.

The plaintiff, Dominic Oliveira, is an alum of Prime's apprenticeship program. He was not paid for the time he spent in orientation and was paid on a per-mile basis while driving as a B2 trainee, although Prime docked his pay during this period to recoup the $200 advances that it paid him during the supervised-driving period.

Drivers are relieved of paying tuition for the apprenticeship program as long as they remain with Prime for one year as either company drivers or independent contractors. After completing the program, drivers choose between the two options, and Prime offers a $100 bonus to those who elect independent-contractor status. When Oliveira finished the apprenticeship program, Prime representatives informed him that he would make more money as an independent contractor than a company driver. Prime directed Oliveira to Abacus Accounting (Abacus) — a company with offices on the second floor of Prime's building — to assist him in forming a limited liability company (LLC). After Oliveira filled out a form provided by Abacus and listed his preferred LLC names, Abacus created Hallmark Trucking LLC (Hallmark) on Oliveira's behalf.

Prime then directed Oliveira to the offices of Success Leasing (Success) — located on the first floor of the same building

— for help in securing a truck.  After selecting a truck, Oliveira was informed that his first load of freight was ready to be trucked for Prime, and he was instructed to sign the highlighted portions of several documents before hitting the road.  He hastily did so, and Prime then steered him towards its company store, where he purchased — on credit — $5,000 worth of truck equipment and fuel.

Among the documents Oliveira signed was an Independent Contractor Operating Agreement (the contract) between Prime and Hallmark.[3]  The contract specified that the relationship between the parties was that "of carrier and independent contractor and not an employer/employee relationship" and that "[Oliveira is] and shall be deemed for all purposes to be an independent contractor, not an employee of Prime."[4]  Additionally, under the contract, Oliveira retained the rights to provide transportation services to companies besides Prime,[5] refuse to haul any load offered by Prime,

---

[3] Around ten months later, Hallmark and Prime executed another Independent Contractor Operating Agreement.  Because the pertinent language of the two agreements is identical, we refer to them collectively as "the contract."  When quoting the contract in this opinion, we omit any unnecessary capitalization.

[4] Although the contract was between Prime and Hallmark, Prime has — with one small exception discussed below, see note 15, infra — treated the contract as one between Prime and Oliveira.  We similarly treat Oliveira and Hallmark interchangeably.

[5] Before he could drive for another carrier, however, Oliveira was contractually obligated to give Prime five days' advance notice and to "remove all identification devices, licenses and base plates from the [truck] and return [them] to Prime."

and determine his own driving times and delivery routes. The contract also obligated Oliveira to pay all operating and maintenance expenses, including taxes, incurred in connection with his use of the truck leased from Success. Finally, the contract contained an arbitration clause under which the parties agreed to arbitrate "any disputes arising under, arising out of or relating to [the contract], . . . including the arbitrability of disputes between the parties."[6]

Oliveira alleges that, during his Hallmark days, Prime exercised significant control over his work. According to Oliveira, Prime required him to transport Prime shipments, mandated that he complete Prime training courses and abide by its procedures, and controlled his schedule. Because of Prime's pervasive involvement in his trucking operation, Oliveira was unable to work for any other trucking or shipping companies.

Prime consistently shortchanged Oliveira during his time as an independent contractor. Eventually, Oliveira — frustrated and, he alleges, unlawfully underpaid — stopped driving for Prime. It was a short-lived separation, however; Prime rehired Oliveira a month later, this time as a company driver. Oliveira alleges that his job responsibilities as a company driver were

---

[6] The arbitration provision also specified that "arbitration between the parties will be governed by the Commercial Arbitration Rules of the American Arbitration Association [(AAA)]."

"substantially identical" to those he had as an independent contractor. Job responsibilities were not the only constant; Oliveira's pay as a company driver was as paltry as ever.

Oliveira filed this class action against Prime, alleging that Prime violated the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201-219, as well as the Missouri minimum-wage statute, by failing to pay its truck drivers minimum wage. Oliveira also asserted a class claim for breach of contract or unjust enrichment and an individual claim for violation of Maine labor statutes. Prime moved to compel arbitration under the FAA and stay the proceedings or, alternatively, to dismiss the complaint for improper venue and the breach of contract/unjust enrichment count for failure to state a claim upon which relief may be granted.[7] In its motion, Prime asserted that "Oliveira . . . entered into an Independent Contractor Operating Agreement with . . . Prime . . . to work as an owner-operator truck driver." (Emphasis added.)

In response, Oliveira argued that, because he was not a party to the contract between Prime and Hallmark, he could not be personally bound by any of its provisions, including the arbitration clause. He further contended that the motion to compel arbitration should be denied because, among other reasons, the

---

[7] Because the district court never addressed the alternative arguments for dismissal and Prime has not pressed them on appeal, we focus only on the motion to compel arbitration.

contract is exempted from the FAA under § 1. He also argued that the question of the applicability of the § 1 exemption was one for the court, and not an arbitrator, to decide.

Prime disputed Oliveira's argument that he could not be personally bound by the contract between Prime and Hallmark, stating that "Oliveira and Hallmark Trucking are factually one and the same." Prime also took issue with both of Oliveira's other arguments, contending that the § 1 exemption does not include independent-contractor agreements and, in any event, the question of whether the § 1 exemption applies is a question of arbitrability that the parties had delegated to the arbitrator.[8]

The district court proceeded straight to the FAA issues and concluded that the question of the applicability of the § 1 exemption was for the court, and not an arbitrator, to decide. And it determined that it could not yet answer that question because (1) the "contracts of employment" language of the § 1 exemption does not extend to independent contractors; and (2) discovery was needed on the issue of whether Oliveira was a Prime employee or an independent contractor before the court could decide

---

[8] The parties also squabbled over whether Oliveira's claims arising from periods of time in which the contract was not in effect — during Oliveira's pre-contract time in the apprenticeship program and his post-contract stint as a company driver — were arbitrable under the arbitration clause of the contract. The district court did not resolve the issue, electing instead to focus on the question of whether the § 1 exemption applied.

- 9 -

whether the contract was a contract of employment under the § 1 exemption.[9]  The district court therefore denied Prime's motion to compel arbitration without prejudice and permitted the parties to conduct discovery on Oliveira's employment status.  Prime timely appealed.[10]

## Analysis

The FAA lies at the center of the two questions raised by this appeal.  Thus, before tackling those questions, we first briefly outline the statutory framework.

To combat deep-rooted judicial hostility towards arbitration agreements, Congress enacted the FAA in 1925.  See Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 111 (2001). Section 2 of the FAA enshrines the "liberal federal policy favoring arbitration agreements," Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983), by declaring that an arbitration agreement in "a contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and

---

[9] The district court noted that the parties did not dispute that Oliveira, as a truck driver, was a transportation worker under the § 1 exemption.

[10] Although interlocutory orders are ordinarily not immediately appealable, the FAA permits immediate appeal from an order denying a motion to compel arbitration.  See 9 U.S.C. § 16(a)(1)(B); Gove, 689 F.3d at 3-4 n.1.  We review the denial of a motion to compel arbitration de novo.  Gove, 689 F.3d at 4.

- 10 -

enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract," 9 U.S.C. § 2.

And the FAA does not simply talk the talk. Instead, two separate provisions provide the bite to back up § 2's bark. See Rent-A-Ctr., W., Inc. v. Jackson, 561 U.S. 63, 70 (2010). First, under § 3, a party may obtain a stay of federal-court litigation pending arbitration. See 9 U.S.C. § 3. Second, § 4 authorizes district courts to grant motions to compel arbitration. See id. § 4.

The scope of the FAA, however, is not unbounded. Section 1 of the FAA provides that the Act shall not apply "to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." Id. § 1. The Supreme Court has interpreted this section to "exempt[] from the FAA . . . contracts of employment of transportation workers." Circuit City, 532 U.S. at 119.

This case presents us with two questions pertaining to the § 1 exemption. We address each question in turn.

## A.    Who Decides Whether the § 1 Exemption Applies?

The question of whether the district court or the arbitrator decides the applicability of the § 1 exemption is one of first impression in this circuit. The parties champion dueling out-of-circuit precedent in support of their respective positions on this issue. Relying on the Eighth Circuit's decision in Green

v. SuperShuttle International, Inc., 653 F.3d 766 (8th Cir. 2011), Prime argues that the question of whether the § 1 exemption applies is a question of arbitrability that must be decided by the arbitrator where, as here, the parties have delegated such questions to the arbitrator.

In Green, the plaintiffs, a class of shuttle-bus drivers, alleged that the defendant, a shuttle-bus company, misclassified the drivers as franchisees instead of classifying them as employees. 653 F.3d at 767-68. When the defendant moved under the FAA to compel arbitration pursuant to the arbitration clause contained in the parties' contracts, the plaintiffs countered that their contract was outside the scope of the FAA by virtue of the § 1 exemption. Id. at 768. The Eighth Circuit upheld the district court's grant of the defendant's motion, concluding that "[a]pplication of the FAA's transportation worker exemption is a threshold question of arbitrability" in the parties' dispute. Id. at 769. Because the parties' agreements incorporated the AAA rules, which provide that the arbitrator has the power to determine his or her own jurisdiction, the court concluded that the parties agreed to allow the arbitrator to determine threshold questions of arbitrability, including the applicability of the § 1 exemption. Id.

With Green as its guide, Prime offers several reasons why the question of § 1's applicability is one for the arbitrator

to determine, but each of these arguments flows from the Green court's characterization of this issue as a question of arbitrability.  The case on which Oliveira relies — the Ninth Circuit's decision in In re Van Dusen, 654 F.3d 838 (9th Cir. 2011) — considered this characterization to be a flawed starting premise.

Van Dusen arose on facts strikingly similar to those in this case; the plaintiffs, interstate truck drivers, alleged that one of the defendants, a trucking company, misclassified its truck drivers as independent contractors to circumvent the requirements of the FLSA and parallel state laws.  See id. at 840; see also Van Dusen v. Swift Transp. Co., 830 F.3d 893, 895 (9th Cir. 2016) (later appeal in same case).  The defendant moved to compel arbitration under the FAA, and the plaintiffs opposed that motion, asserting that the § 1 exemption applied to their contracts.  Van Dusen, 654 F.3d at 840.  The district court ordered arbitration, concluding that the question of whether the § 1 exemption applied was one for the arbitrator to decide in the first instance.  Id. After the district court refused the plaintiffs' request for certification of an interlocutory appeal, the plaintiffs sought mandamus relief before the Ninth Circuit.  Id.

The Ninth Circuit ultimately declined to issue the extraordinary remedy of mandamus relief because the district court's conclusion was not clearly erroneous in light of the dearth of federal appellate authority addressing the issue and the general

- 13 -

federal policy in favor of arbitration.  Id. at 845-46.  The court nonetheless outlined why "the best reading of the law requires the district court to assess whether [the §] 1 exemption applies before ordering arbitration" under the FAA.  Id. at 846.  The court explained that, because a district court's authority to compel arbitration under the FAA exists only where the Act applies, "a district court has no authority to compel arbitration under Section 4 [of the FAA] where Section 1 exempts the underlying contract from the FAA's provisions."  Id. at 843.  The court elaborated:

> In essence, [the d]efendants and the [d]istrict [c]ourt have adopted the position that contracting parties may invoke the authority of the FAA to decide the question of whether the parties can invoke the authority of the FAA.  This position puts the cart before the horse: Section 4 has simply no applicability where Section 1 exempts a contract from the FAA, and private contracting parties cannot, through the insertion of a delegation clause, confer authority upon a district court that Congress chose to withhold.

Id. at 844.  The court also concluded that the question of whether the § 1 exemption applies "does not fit within th[e] definition" of "questions of arbitrability."  Id.

After careful consideration of these competing cases, we are persuaded that the Ninth Circuit hit the nail on the head, and we therefore hold that the issue of whether the § 1 exemption applies presents a question of "whether the FAA confers authority on the district court to compel arbitration" and not a question of arbitrability.  Id.

- 14 -

"The Supreme Court defines 'questions of arbitrability' as questions of 'whether the parties have submitted a particular dispute to arbitration.'" Id. (quoting Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002)); see also Rent-A-Ctr., 561 U.S. at 68-69 ("[P]arties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy."); *Arbitrability*, Black's Law Dictionary (10th ed. 2014) (defining arbitrability as "[t]he status, under applicable law, of a dispute's being or not being resolvable by arbitrators because of the subject matter"). In this case, determining whether the § 1 exemption applies to the contract does not entail any consideration of whether Prime and Oliveira have agreed to submit a dispute to arbitration; instead, it raises the "distinct inquiry" of whether the district court has the authority to act under the FAA — specifically, the authority under § 4 to compel the parties to engage in arbitration. Van Dusen, 654 F.3d at 844.

Therefore, as the Ninth Circuit explained in Van Dusen, the question of the court's authority to act under the FAA is an "antecedent determination" for the district court to make before it can compel arbitration under the Act. Id. at 843. Prime's argument to the contrary "puts the cart before the horse" and makes no sense. Id. at 844. The following scenario readily demonstrates why this is so: First, assume that two parties enter into a

- 15 -

contract containing an arbitration clause with language identical to that contained in the contract in this case, including a provision delegating questions of arbitrability to the arbitrator. Second, assume that, unlike in this case, the parties are in agreement that the contract involved is clearly a contract of employment of a transportation worker. Third, assume that, as in this case, one of the parties, relying solely on the FAA, moves to compel arbitration. Taking Prime's position to its logical conclusion, the district court would be obligated to grant the motion because the parties have agreed to allow the arbitrator to decide questions of arbitrability, including whether the § 1 exemption applies. See Green, 653 F.3d at 769. This would be so even though the § 1 exemption indisputably applies to the contract, such that the district court had no authority to act under the FAA in the first place. See Van Dusen, 654 F.3d at 843 ("[A] district court has no authority to compel arbitration under Section 4 where Section 1 exempts the underlying contract from the FAA's provisions.").[11]

---

[11] When confronted with the logical extreme of its position at oral argument, Prime sought to qualify it to some degree. Prime insisted that, so long as the party seeking to compel arbitration had a good-faith basis for asserting that the § 1 exemption did not apply, the question of the applicability of the § 1 exemption would need to be arbitrated under the delegation clause of the arbitration agreement. But, even with this minor qualification, Prime's position still boils down to the conclusion that the district court can compel arbitration under the FAA before determining whether it has authority to act under the FAA, even in

This position cannot be correct. When the only basis for seeking arbitration in federal court is the FAA, the district court can grant the requested relief only if it has authority to act under the FAA. See id. at 843. If the FAA does not apply, "private contracting parties cannot, through the insertion of a delegation clause, confer authority upon a district court [i.e., to compel arbitration under the FAA] that Congress chose to withhold." Id. at 844. Therefore, "the district court must make an antecedent determination that a contract is arbitrable under Section 1 of the FAA before ordering arbitration pursuant to Section 4." Id. at 843.

Because we reject Green's starting premise — that the issue of § 1's applicability is a question of arbitrability — we are unpersuaded by Green's reliance on a contract's incorporation of the AAA rules, which allow an arbitrator to determine his or her own jurisdiction. Where, as here, the parties dispute whether the district court has the authority to compel arbitration under the FAA, the extent of the arbitrator's jurisdiction is of no concern. Instead, we are concerned only with the question of whether the district court has authority to act under a federal statute. Nothing in the AAA rules — including the power to determine the arbitrator's jurisdiction — purports to allow the

_____

a case where it might not have such authority. We do not accept this position.

- 17 -

arbitrator to decide whether a federal district court has the authority to act under a federal statute.[12]

For all these reasons, we join our colleagues on the Ninth Circuit and hold that the question of whether the § 1 exemption applies is an antecedent determination that must be made by the district court before arbitration can be compelled under the FAA.  But we can't stop there.

---

[12] We are likewise unmoved by each of Prime's subsidiary arguments, all of which are grounded on the question-of-arbitrability premise that we reject.  For example, Prime's invocation of the liberal federal policy in favor of arbitration and its corollary, the principle that any doubts about the scope of arbitrable issues should be resolved in favor of arbitration, goes nowhere because we are not confronted with a scope question.  See Paul Revere Variable Annuity Ins. Co. v. Kirschhofer, 226 F.3d 15, 25-26 (1st Cir. 2000).  Similarly, Prime's argument that, so long as the court is "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue," 9 U.S.C. § 4, the court must compel arbitration overlooks that one does not even approach the § 4 inquiry until one first determines that the § 1 exemption does not apply.  See Van Dusen, 654 F.3d at 843-44.  Finally, Prime's effort to compare the question of the applicability of the § 1 exemption to questions concerning the validity of an agreement or whether it can be enforced by the party seeking to compel arbitration — questions that can be referred to the arbitrator — is unavailing.  Issues concerning alleged flaws with an agreement's validity or enforceability are fundamentally different than the issue of the district court's authority to act under the FAA in the first place.  See id. at 844 ("[P]rivate contracting parties cannot, through the insertion of a delegation clause, confer authority upon a district court that Congress chose to withhold.").  Additionally, it is not unusual for a court to first decide a specific challenge to the validity or enforceability of the arbitration clause that a party is seeking to enforce.  See Rent-A-Ctr., 561 U.S. at 71; Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 403-04 (1967).

## B.   Independent Contractors and the § 1 Exemption

After concluding that it must decide for itself whether the § 1 exemption applies, the district court in this case ordered the parties to conduct factual discovery to determine whether Oliveira was truly an independent contractor or instead was in reality a Prime employee during the time that the contract was in place.  Discovery on that issue was necessary, in the court's view, because "courts generally agree that the § 1 exemption does not extend to independent contractors."

On appeal, both parties challenge this aspect of the district court's order.  Prime agrees that § 1 does not extend to independent contractors, but it argues that discovery on the relationship between the parties is inappropriate because Oliveira's status as a Prime employee or independent contractor should be decided by the arbitrator.  See AT&T Techs., Inc. v. Comm'cns Workers of Am., 475 U.S. 643, 649 (1986) ("[I]n deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims.").  Alternatively, Prime argues that if the district court must determine whether the § 1 exemption applies, it should consider only whether the face of the contract demonstrates an intent to make Oliveira an independent contractor.  Oliveira, on the other hand, argues that the § 1 exemption covers the employment contracts of "all transportation workers, including

independent contractors." If we agree with Oliveira, discovery is not needed.

Thus, the question presented is whether the § 1 exemption extends to transportation-worker agreements that establish or purport to establish independent-contractor relationships, and we review this issue of statutory interpretation de novo.[13] See United States v. Maldonado-Burgos, 844 F.3d 339, 340 (1st Cir. 2016). As

---

[13] We have considered the possibility, proposed by our dissenting colleague, of remanding without deciding this question of statutory interpretation. The benefit of this approach, according to the dissent, would be avoiding this difficult legal question now on the chance that the discovery contemplated by the district court might lead to a conclusion that Oliveira is not an independent contractor — a conclusion that would moot, for this case, the question whether independent contractors are within the exemption. But we do not view this approach as a viable option because the district court ordered discovery based on its legal conclusion that "the § 1 exemption does not extend to independent contractors." If that legal conclusion is incorrect — an issue that Oliveira sufficiently raised below and both parties have briefed on appeal — there is no need for discovery in the first place. Therefore, we will not adopt an approach that assumes away one of the live issues on appeal simply because the issue is a difficult one. Cf. Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 375 (2010) (Roberts, C.J., concurring) ("It should go without saying . . . that we cannot embrace a narrow ground of decision simply because it is narrow; it must also be right. Thus while it is true that '[i]f it is not necessary to decide more, it is necessary not to decide more,' . . . sometimes it is necessary to decide more. There is a difference between judicial restraint and judicial abdication."). Finally, we note that we are not convinced that the dissent's approach in fact provides a narrower ground of decision; such an approach would require us to address Prime's contention (which the dissent implicitly rejects) that discovery on the parties' relationship would render the contractual right to arbitration a nullity. Addressing that contention would present its own set of challenges, but, given the manner in which we decide the statutory-interpretation question, that issue is the one that need not be decided in this appeal.

always, the statutory text is our starting point. See id. The § 1 exemption provides that nothing contained in the FAA "shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1 (emphasis added). The Supreme Court has declared that "[§] 1 exempts from the FAA only contracts of employment of transportation workers." Circuit City, 532 U.S. at 119.

Before embarking on our analysis, we first identify two issues that we need not decide. First, Prime does not dispute that Oliveira, whose work for Prime included driving a truck across state lines, is a "transportation worker" within the meaning of the § 1 exemption, as interpreted by Circuit City.[14] Thus, we have

---

[14] The district court's decision indicated that the parties did not dispute this issue. Similarly, Prime did not argue in its opening brief that Oliveira is not a transportation worker. In a single sentence in its reply brief, Prime asserts that this court "has never extended the [§] 1 [e]xemption to truck drivers, as opposed to rail workers and seamen (the core workers of concern when Congress enacted the exemption)." To the extent that Prime intended this lone sentence to resurrect the transportation-worker issue in this case, we will not allow it. Any such "argument" is wholly undeveloped, see United States v. Sevilla-Oyola, 770 F.3d 1, 13 (1st Cir. 2014) ("Arguments raised in only a perfunctory and undeveloped manner are deemed waived on appeal."), and, moreover, an argument that makes its debut in a reply brief will not receive a warm ovation from us, see United States v. Arroyo-Blas, 783 F.3d 361, 366 n.5 (1st Cir. 2015) ("[A] legal argument made for the first time in an appellant's reply brief comes too late and need not be addressed." (quoting United States v. Brennan, 994 F.2d 918, 922 n.7 (1st Cir. 1993))). Finally, we note in passing that Prime's position has not been accepted elsewhere. See, e.g., Lenz v. Yellow Transp., Inc., 431 F.3d 348, 351 (8th Cir. 2005)

no need to definitively decide that issue.  Second, we note that, although the parties to the contract are Prime and Hallmark, Prime has, both below and on appeal, treated the contract as one between Oliveira and Prime.[15]  We do the same.  Therefore, because the parties do not dispute that Oliveira is a transportation worker under § 1, we need not address whether an LLC or other corporate entity can itself qualify as a transportation worker.  We also need not address the scope of the word "worker" in the residual clause of the § 1 exemption.  Accordingly, we limit our focus to the issue of whether an agreement between a trucking company and an individual transportation worker cannot be a "contract of

---

("Indisputably, if Lenz were a truck driver, he would be considered a transportation worker under § 1 of the FAA."); Harden v. Roadway Package Sys., Inc., 249 F.3d 1137, 1140 (9th Cir. 2001) ("As a delivery driver for RPS, Harden contracted to deliver packages 'throughout the United States, with connecting international service.'  Thus, he engaged in interstate commerce that is exempt from the FAA.").

[15]  Before the district court, Prime opposed Oliveira's argument that he could not be personally bound by the terms of the contract between Prime and Hallmark by arguing that "Oliveira and Hallmark Trucking are factually one and the same."  Along similar lines, Prime stated in its opening brief that "Oliveira entered into an Independent Contractor Operating Agreement . . . with Prime" (emphasis added), and its brief proceeded on the assumption that Oliveira and Hallmark were interchangeable.  In its reply brief, for the first time in this case, Prime relies on the fact that the contract was between Prime and Hallmark in arguing that the contract established an independent-contractor relationship.  We need not decide whether Prime is judicially estopped from taking this position at this late juncture; it suffices that a reply brief is not the appropriate place to switch gears and offer new arguments.  See Arroyo-Blas, 783 F.3d at 366 n.5.

employment" within the meaning of § 1 if the agreement establishes or purports to establish an independent-contractor relationship.

Prime points out that the weight of district-court authority to consider the issue has concluded that the § 1 exemption does not extend to contracts that establish or purport to establish an independent-contractor relationship.[16] Several of these decisions simply assume, explicitly or implicitly, that independent-contractor agreements are not contracts of employment under § 1. See, e.g., Aviles, 2015 WL 5601824, at *6; Doe, 2015 WL 274092, at *3; Villalpando, 17 F. Supp. 3d at 982; Bell, 2009

---

[16] See, e.g., Aviles v. Quik Pick Express, LLC, No. CV-15-5214-MWF (AGR), 2015 WL 5601824, at *6 (C.D. Cal. Sept. 23, 2015); Morning Star Assocs., Inc. v. Unishippers Glob. Logistics, LLC, No. CV-115-033, 2015 WL 2408477, at *5-7 (S.D. Ga. May 20, 2015); Doe v. Swift Transp. Co., No. 2:10-cv-00899 JWS, 2015 WL 274092, at *3 (D. Ariz. Jan. 22, 2015); Alvarado v. Pac. Motor Trucking Co., No. EDCV 14-0504-DOC(DTBx), 2014 WL 3888184, at *4-5 (C.D. Cal. Aug. 7, 2014); Villalpando v. Transguard Ins. Co. of Am., 17 F. Supp. 3d 969, 982 (N.D. Cal. 2014); Carney v. JNJ Express, Inc., 10 F. Supp. 3d 848, 852 (W.D. Tenn. 2014); Port Drivers Fed'n 18, Inc. v. All Saints, 757 F. Supp. 2d 463, 472 (D.N.J. 2011); Davis v. Larson Moving & Storage Co., Civ. No. 08-1408 (JNE/JJG), 2008 WL 4755835, at *4 (D. Minn. Oct. 27, 2008); Owner-Operator Indep. Drivers Ass'n v. United Van Lines, LLC, No. 4:06CV219 JCH, 2006 WL 5003366, at *3 (E.D. Mo. Nov. 15, 2006); Owner-Operator Indep. Drivers Ass'n v. Swift Transp. Co., 288 F. Supp. 2d 1033, 1035-36 (D. Ariz. 2003); Roadway Package Sys., Inc. v. Kayser, No. CIV. A. 99-MC-111, 1999 WL 817724, at *4 n.4 (E.D. Pa. Oct. 13, 1999); see also Performance Team Freight Sys., Inc. v. Aleman, 194 Cal. Rptr. 3d 530, 536-37 (Cal. Ct. App. 2015); Johnson v. Noble, 608 N.E.2d 537, 540 (Ill. App. Ct. 1992); cf. Bell v. Atl. Trucking Co., No. 3:09-cv-406-J-32MCR, 2009 WL 4730564, at *4-6 (M.D. Fla. Dec. 7, 2009) (conducting analysis on applicability of § 1 exemption on assumption it does not apply to independent contractors).

WL 4730564, at *4-6; Davis, 2008 WL 4755835, at *4; Kayser, 1999 WL 817724, at *4 n.4; see also Johnson, 608 N.E.2d at 540.[17] Other courts have "simply go[ne] along with the developing group consensus," In re Atlas IT Exp. Corp., 761 F.3d 177, 183 (1st Cir. 2014), without adding any independent analysis. See, e.g., Alvarado, 2014 WL 3888184, at *4-5; Carney, 10 F. Supp. 3d at 853; All Saints, 757 F. Supp. 2d at 472; see also Aleman, 194 Cal. Rptr. 3d at 536-37. The few district-court decisions that offer independent analysis to support the conclusion that the § 1 exemption does not cover independent-contractor agreements have,

---

[17] This assumption was implicit in Judge Ikuta's dissenting opinion in In re Swift Transportation Co., 830 F.3d 913 (9th Cir. 2016). The majority in Swift determined that mandamus relief was not warranted because the district court's proposed course of action — "resolv[ing] the § 1 question through discovery and a trial" — was not clearly erroneous; the district court's decision was not contrary to any Supreme Court or Ninth Circuit precedent, and "there [did] not appear to be any decisions from [the other] circuits on the question of whether the FAA compels a certain procedural choice in a district court's § 1 determination." Id. at 917. Judge Ikuta dissented, expressing her belief that the § 1 determination should be made solely from an examination of the contract's terms. Id. at 920-21 (Ikuta, J., dissenting). Implicit in Judge Ikuta's dissent is the assumption that independent-contractor agreements are not contracts of employment under the FAA. But there was good reason for that assumption in the circumstances of that case: Unlike in this case, none of the litigants argued that independent-contractor agreements of transportation workers are contracts of employment. And the district court in that case simply assumed — with no analysis or citation to authority — that the § 1 exemption covered only contracts between employers and employees. See Doe, 2015 WL 274092, at *3 ("Whether the parties formed an employment contract — that is whether plaintiffs were hired as employees — necessarily involves a factual inquiry apart from the contract itself.").

viewed collectively, offered two reasons for that conclusion: first, that this interpretation is consistent with the "strong and liberal federal policy favoring arbitral dispute resolution," Swift Transp., 288 F. Supp. 2d at 1035-36; see also Morning Star, 2015 WL 2408477, at *5; United Van Lines, 2006 WL 5003366, at *3; and, second, that such a rule is justified by the narrow construction that the Supreme Court has instructed courts to give the § 1 exemption, see United Van Lines, 2006 WL 5003366, at *3.

Prime urges us to add our voice to this "judicial chorus," but we are unwilling to do so. Interpreting a federal statute is not simply a numbers game. See In re Atlas IT Exp. Corp., 761 F.3d at 182-83 ("The numbers favoring a rule do not necessarily mean that the rule is the best one. Indeed, there is an observable phenomenon in our courts of appeal and elsewhere — sometimes called 'herding' or 'cascading' — where decisionmakers who first encounter a particular issue (i.e., the first court to consider a question) are more likely to rely on the record presented to them and their own reasoning, while later courts are increasingly more likely to simply go along with the developing group consensus."). Instead of simply tallying the score, "it is always incumbent on us to decide afresh any issue of first impression in our circuit." Id. at 183. After conducting that fresh look in this case, we are distinctly unpersuaded by the district courts' treatment of this issue.

The fatal flaw in the district-court authority on which Prime relies is a failure to closely examine the statutory text — the critical first step in any statutory-interpretation inquiry. See Maldonado-Burgos, 844 F.3d at 340. Because Congress did not provide a definition for the phrase "contracts of employment" in the FAA, we "give it its ordinary meaning." United States v. Stefanik, 674 F.3d 71, 77 (1st Cir. 2012) (quoting United States v. Santos, 553 U.S. 507, 511 (2008)). And we discern the ordinary meaning of the phrase at the time Congress enacted the FAA in 1925. See Perrin v. United States, 444 U.S. 37, 42 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning. Therefore, we look to the ordinary meaning of the term . . . at the time Congress enacted the statute . . . ." (citation omitted)); see also Sandifer v. U.S. Steel Corp., 134 S. Ct. 870, 876 (2014) (consulting "[d]ictionaries from the era of [statutory provision's] enactment" to espy ordinary meaning of undefined term); Carcieri v. Salazar, 555 U.S. 379, 388 (2009) ("We begin with the ordinary meaning of the word 'now,' as understood when the [statute] was enacted.").[18] We now turn to that task.

_____

[18] At oral argument, Prime insisted that the Supreme Court in Circuit City rejected this approach for discerning the plain meaning of the FAA's text. But the Court did no such thing. In that case, the Court was confronted with an argument that, "because

- 26 -

## 1.   Ordinary Meaning of Statutory Text

Oliveira argues that the phrase "contracts of employment" contained in § 1 means simply "agreements to do work." We agree.  This interpretation is consistent with the ordinary meaning of the phrase at the time Congress enacted the FAA.

Dictionaries from the era of the FAA's enactment confirm that the ordinary meaning of "contracts of employment" in 1925 was agreements to perform work.  See Webster's New International Dictionary of the English Language 488 (W.T. Harris & F. Sturges Allen eds., 1923) (defining "contract" when used as noun as "[a]n

---

the FAA was enacted when congressional authority to regulate under the commerce power was to a large extent confined by [Supreme Court] decisions," the phrase "engaged in commerce" in § 1 should be interpreted as "expressing the outer limits of Congress'[s] power as then understood." Circuit City, 532 U.S. at 116.  The Court rejected this argument, which it characterized as "[a] variable standard" depending on "shifts in the Court's Commerce Clause cases" that would require courts to "take into account the scope of the Commerce Clause, as then elaborated by the Court, at the date of the FAA's enactment in order to interpret what the statute means now." Id. at 116-17.  The Court reasoned that "[i]t would be unwieldy for Congress, for the Court, and for litigants to be required to deconstruct statutory Commerce Clause phrases depending upon the year of a particular statutory enactment." Id. at 118.  In this case, by contrast, our attempt to discern the ordinary meaning of the phrase "contracts of employment" does not require us to sort through paradigm shifts in Supreme Court precedent but simply to apply the "fundamental canon of statutory construction" that undefined statutory terms should be given their ordinary meaning at the time of the statute's enactment, Sandifer, 134 S. Ct. at 876 (quoting Perrin, 444 U.S. at 42) — a canon that has been applied in FAA cases since Circuit City.  See, e.g., Conrad v. Phone Directories Co., 585 F.3d 1376, 1381-82 & n.1 (10th Cir. 2009) (in interpreting undefined term in § 16 of FAA, consulting dictionary from era of § 16's enactment).

agreement between two or more persons to do or forbear something");
id. at 718 (defining "employment" as "[a]ct of employing, or state
of being employed" and listing "work" as synonym for "employment");
id. (defining "employ" as "[t]o make use of the services of; to
have or keep at work; to give employment to"); see also Webster's
Collegiate Dictionary 329 (3d ed. 1925) (providing similar
definition of "employment" and similarly listing "work" as synonym
for "employment"); id. (defining "employ" as "[t]o make use of;
use" and "[t]o give employment or work to" and explaining "[e]mploy
is specifically used to emphasize the idea of service to be
rendered").  In other words, these contemporary dictionaries do
not suggest that "contracts of employment" distinguishes employees
from independent contractors.[19]

---

[19] Although not referenced by either party, we note that the
current edition of Black's Law Dictionary indicates that the
earliest known use of the phrase "employment contract" was 1927 —
two years after the FAA's enactment.  See *Employment Contract*,
Black's Law Dictionary (10th ed. 2014); id. at xxxi (explaining
that "[t]he parenthetical dates preceding many of the definitions
show the earliest known use of the word or phrase in English").
The current edition also indicates that "contract of employment"
is a synonym for "employment contract," and it defines "employment
contract" in a manner that arguably excludes independent
contractors: "[a] contract between an employer and employee in
which the terms and conditions of employment are stated."
*Employment Contract*, Black's Law Dictionary (10th ed. 2014).  It
is unclear whether the unknown source from 1927 provided the basis
for the current definition of "employment contract" or, instead,
whether that source has merely been identified as the first known
use of the phrase.  We need not, however, dwell on this point
because, as explained below, several sources from the era of the
FAA's enactment use the phrase "contract of employment" to refer
to independent contractors.  Additionally, we note that the two

Additionally, this ordinary meaning of "contracts of employment" is further supported by other authorities from the era of the FAA's enactment, which suggest that the phrase can encompass agreements of independent contractors to perform work. See, e.g., Annotation, Teamster as Independent Contractor Under Workmen's Compensation Acts, 42 A.L.R. 607, 617 (1926) ("When the contract of employment is such that the teamster is bound to discharge the work himself, the employment is usually one of service, whereas, if, under the contract, the teamster is not obligated to discharge the work personally, but may employ others to that end and respond to the employer only for the faithful performance of the contract, the employment is generally an independent one." (emphasis added)); Theophilus J. Moll, A Treatise on the Law of Independent Contractors & Employers' Liability 47-48 (1910) ("It has been laid down that the relation of master and servant will not be inferred in a case where it appears that the power of discharge was not an incident of the contract of employment." (emphasis added)); id. at 334 ("The [independent] contractor . . . is especially liable for his own acts when he assumes this liability in his contract of employment." (emphasis added)).[20]

_____

editions of Black's Law Dictionary that bookend the FAA's enactment, see Black's Law Dictionary (3d ed. 1933); Black's Law Dictionary (2d ed. 1910), provide no definition for the phrases "contract of employment" or "employment contract."

[20] See also Luckie v. Diamond Coal Co., 183 P. 178, 182 (Cal. Dist. Ct. App. 1919) ("We think that the nature of Foulk's relation

to defendant at the time of the accident, whether that of an independent contractor or servant, must be determined not alone from the terms of the written contract of employment, but from the subsequent conduct of each, known to and acquiesced in by the other." (emphasis added)); Hamill v. Territilli, 195 Ill. App. 174, 175 (1915) ("[T]he only question in the case was whether or not, under the contract of employment, the relationship existing between Territilli and Scully and the appellant was that of independent contractor or that of master and servant . . . ." (emphasis added)); Eckert's Case, 124 N.E. 421, 421 (Mass. 1919) ("It was provided by his contract of employment that he should furnish the team, feed, take care of and drive the horses for a fixed daily remuneration.  The entire management and mode of transportation were under his control . . . . It is plain as matter of law . . . that when injured he was not an employé of the town but an independent contractor." (emphasis added) (citations omitted)); Lindsay v. McCaslin, 122 A. 412, 413 (Me. 1923) ("When the contract of employment has been reduced to writing, the question whether the person employed was an independent contractor or merely a servant is determined by the court as a matter of law." (emphasis added)); Allen v. Bear Creek Coal Co., 115 P. 673, 679 (Mont. 1911) ("The relation of the parties under a contract of employment is determined by an answer to the question, Does the employé in doing the work submit himself to the direction of the employer, both as to the details of it and the means by which it is accomplished?  If he does, he is a servant, and not an independent contractor.  If, on the other hand, the employé has contracted to do a piece of work, furnishing his own means and executing it according to his own ideas, in pursuance of a plan previously given him by the employer, without being subject to the orders of the latter as to detail, he is an independent contractor." (emphasis added)); Tankersley v. Webster, 243 P. 745, 747 (Okla. 1925) ("[T]he contract of employment between Tankersley and Casey was admitted in evidence without objections, and we think conclusively shows that Casey was an independent contractor." (emphasis added)); Kelley v. Del., L. & W. R. Co., 113 A. 419, 419 (Pa. 1921) ("The question for determination is whether deceased was an employee of defendant or an independent contractor . . . . To decide, it is necessary to construe the written contract of employment . . . ." (emphasis added)); U.S. Fid. & Guar. Co. of Baltimore, Md. v. Lowry, 231 S.W. 818, 822 (Tex. Civ. App. 1921) (stating that, in determining whether person "was an employé and not an independent contractor," "'[n]o single fact is more conclusive as to the effect of the contract of employment, perhaps, than the unrestricted right of the employer to end the particular service whenever he chooses, without regard to the final result of

Prime seeks to downplay the significance of these other authorities, noting that they do not deal with the FAA. True enough, but the phrase "contracts of employment" must have some meaning, and Prime does not attempt to explain how its proposed interpretation is consistent with the ordinary meaning of the words used in the statute. And the lack of a textual anchor is not the only flaw in Prime's interpretation. In Circuit City, the Supreme Court noted "Congress'[s] demonstrated concern with transportation workers and their necessary role in the free flow of goods" at the time when it enacted the FAA. 532 U.S. at 121. Given that concern, the distinction that Prime advocates based on the precise employment status of the transportation worker would have been a strange one for Congress to draw: Both individuals who are independent contractors performing transportation work and

the work itself'" (emphasis added) (quoting Cockran v. Rice, 128 N.W. 583, 585 (S.D. 1910))); Annotation, General Discussion of the Nature of the Relationship of Employer and Independent Contractor, 19 A.L.R. 226, 250 (1922) (discussing "the question whether a contract of employment is one of an independent quality").

Along similar lines, legal dictionaries from the era of the FAA's enactment used the term "employment" as part of the definition of "independent contractor." See, e.g., *Independent Contractor*, Ballentine's Law Dictionary (1930) (defining independent contractor as "[o]ne who, exercising an independent employment, contracts to do a piece of work according to his own methods and without being subject to the control of his employer except as to the result of the work"); *Independent Contractor*, Black's Law Dictionary (3d ed. 1933) (same); *Independent Contractor*, Black's Law Dictionary (2d ed. 1910) (same); 2 Francis Rawle, Bouvier's Law Dictionary & Concise Encyclopedia 1533 (3d rev. 1914) (same).

employees performing that same work play the same necessary role in the free flow of goods.

In sum, the combination of the ordinary meaning of the phrase "contracts of employment" and Prime's concession that Oliveira is a transportation worker compels the conclusion that the contract in this case is excluded from the FAA's reach. Because the contract is an agreement to perform work of a transportation worker, it is exempt from the FAA. We therefore decline to follow the lead of those courts that have simply assumed that contracts that establish or purport to establish independent-contractor relationships are not "contracts of employment" within the meaning of § 1.

### 2. Narrow Construction and Policy Favoring Arbitration

We also are unpersuaded by the two justifications that some district-court decisions put forward to support the conclusion that the § 1 exemption does not apply to contracts that establish or purport to establish independent-contractor relationships — that such an interpretation is consistent with the need to narrowly construe § 1 and the liberal federal policy favoring arbitration. In our view, neither consideration warrants retreat from the ordinary meaning of the statutory text.

To be sure, the Supreme Court has cautioned that the § 1 exemption must "be afforded a narrow construction." Circuit City, 532 U.S. at 118. Prime seizes on this pronouncement and insists

that it forecloses our conclusion that the § 1 exemption applies to transportation-worker agreements that establish or purport to establish independent-contractor relationships.  We disagree.

In Circuit City, the contract at issue was between Circuit City, a national retailer of consumer electronics, and Adams, a store sales counselor.  532 U.S. at 109-10.  The Ninth Circuit had interpreted the § 1 exemption to exclude all contracts of employment from the FAA's reach.  Id. at 112.  In defense of this interpretation, Adams argued that the phrase "engaged in . . . commerce" in § 1 exempted from the FAA all employment contracts falling within Congress's commerce power.  Id. at 114. The Supreme Court rejected this broad interpretation in favor of a narrower one that was compelled by the text and structure of § 1: "Section 1 exempts from the FAA only contracts of employment of transportation workers."  Id. at 119; see id. at 114-15. Because the phrase "any other class of workers engaged in . . . commerce" appeared in the residual clause of § 1, id. at 114, the Court reasoned that "the residual clause should be read to give effect to the terms 'seamen' and 'railroad employees,' and should itself be controlled and defined by reference to the enumerated categories of workers which are recited just before it," id. at 115.

This context is critical.  The Court announced the need for a narrow construction of the § 1 exemption in the course of

"rejecting the contention that the meaning of the phrase 'engaged in commerce' in § 1 of the FAA should be given a broader construction than justified by its evident language." Id. at 118 (emphasis added). As the Court explained, this broader construction was doomed by the text itself; "the text of the FAA foreclose[d] the [broader] construction of § 1," id. at 119, and "undermine[d] any attempt to give the provision a sweeping, open-ended construction," id. at 118. The Court's narrower interpretation, by contrast, was based on "the precise reading" of that provision. Id. at 119.

It is one thing to say that statutory text compels adoption of a narrow construction over "an expansive construction . . . that goes beyond the meaning of the words Congress used." Id. Prime's argument is very different: It snatches up Circuit City's narrow-construction pronouncement, wholly ignores the context in which that pronouncement was made, and attempts to use it as an escape hatch to avoid the plain meaning of the § 1 exemption's text. But nothing in Circuit City suggests that the need for a narrow construction can override the plain meaning of the statutory language in this fashion, and we reject Prime's attempt to artificially restrict the plain meaning of the text.

Moreover, Oliveira is nothing like the sales counselor in Circuit City. Instead, the truck-driving work that he performs directly impacts "the free flow of goods." Id. at 121. Therefore,

Circuit City's adoption of a narrow construction to cover only transportation workers and not sales counselors is no basis for this court to accept a constricted interpretation of the phrase "contracts of employment" that is inconsistent with both the ordinary meaning of the language used in § 1 and "Congress's demonstrated concern with transportation workers and their necessary role in the free flow of goods." Id. For these reasons, we do not view Circuit City or the narrow-construction principle as supporting Prime's interpretation that the § 1 exemption does not extend to independent contractors.

We are similarly unpersuaded by invocation of the federal policy in favor of arbitration. That policy cannot override the plain text of a statute. See EEOC v. Waffle House, Inc., 534 U.S. 279, 295 (2002) (rejecting notion that "the federal policy favoring arbitration trumps the plain language of Title VII and the contract"); cf. id. at 294 (explaining that, "[w]hile ambiguities in the language of the agreement should be resolved in favor of arbitration, we do not override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated" and concluding that "the proarbitration policy goals of the FAA do not require the [EEOC] to relinquish its statutory authority if it has not agreed to do so" (citation omitted)); Paul Revere, 226 F.3d at 25 (rejecting "attempts to invoke the federal

policy favoring arbitration" because "[t]hat policy simply cannot be used to paper over a deficiency in Article III standing"); Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 116 n.13 (1996) (Souter, J., dissenting) ("[P]lain text is the Man of Steel in a confrontation with background principle[s] and postulates which limit and control." (internal citation and quotation marks omitted)).  As we have explained, a careful examination of the ordinary meaning of the phrase "contracts of employment" — an effort eschewed by the district-court authority cited by Prime — supports our conclusion that the phrase means agreements to perform work and includes independent-contractor agreements.  The federal policy favoring arbitration cannot erase this plain meaning.

### 3.   Final Words

For these reasons, we hold that a transportation-worker agreement that establishes or purports to establish an independent-contractor relationship is a contract of employment under § 1.  We emphasize that our holding is limited: It applies only when arbitration is sought under the FAA, and it has no impact on other avenues (such as state law) by which a party may compel arbitration.[21]

---

[21] Prime insists that, even if the district court is powerless to compel arbitration under the FAA because the § 1 exemption applies, it still can request the district court to "compel arbitration on other grounds, such as state law, or use other tools at its disposal to enforce the parties' explicit agreement to arbitrate — such as dismissing or staying the case."  For his part,

## Conclusion

To recap, we hold that, when confronted with a motion to compel arbitration under § 4 of the FAA, the district court, and not the arbitrator, must decide whether the § 1 exemption applies. Additionally, we hold that transportation-worker agreements that establish or purport to establish independent-contractor relationships are "contracts of employment" within the meaning of the § 1 exemption.[22]  Because the contract in this case is within the § 1 exemption, the FAA does not apply, and we consequently lack jurisdiction under 9 U.S.C. § 16(a)(1)(B) — the only conceivable basis for our jurisdiction over this interlocutory

---

Oliveira appears to suggest that this ship has sailed because Prime's motion to compel was based solely on the FAA.  Prime counters that, to the extent Oliveira is under the impression that Prime has waived the right to compel arbitration on grounds other than the FAA, he is mistaken because no prejudice has been shown. We do not wade into this dispute.  The fleeting references in both parties' briefs are hardly the stuff of developed argumentation, and this waiver issue was not addressed by the district court.  If the parties desire to continue this fight in the district court, they are free to do so.

Along similar lines, although Prime argues in its opening brief that the arbitration provision covers disputes between the parties that arose before and after the time period in which the contract was in effect, it takes a different tack in its reply brief, imploring us to refrain from deciding this issue because the district court did not definitively rule on it below.  We accept Prime's invitation and leave the issue for the district court to address in the first instance.

[22] In light of this conclusion, we need not address the parties' arguments about the necessity and permissibility of discovery in the event that the § 1 exemption does not apply to independent-contractor agreements.

appeal.  See Int'l Bhd. of Teamsters Local Union No. 50 v. Kienstra Precast, LLC, 702 F.3d 954, 957–58 (7th Cir. 2012).  Accordingly, we affirm the district court's denial of Prime's motion to compel arbitration, and dismiss the appeal for lack of appellate jurisdiction.

**-Concurring and Dissenting Opinion Follows-**

BARBADORO, **District Judge**, **concurring in part and dissenting in part**. I agree with the majority that the applicability of the § 1 exemption is a threshold matter for the district court to decide. Where we part company is at the point where the majority decides to take on the difficult issue as to whether transportation-worker agreements that purport to create independent-contractor relationships are exempt from the Federal Arbitration Act. That, in my view, is an issue we need not decide now. Instead, if it ultimately proves necessary to determine whether the § 1 exemption covers all such independent-contractor agreements, the district court should do so in the first instance with the benefit of more in-depth briefing and a fully developed factual record.

The scope of the § 1 exemption comes before us on what amounts to an interlocutory appeal. See Omni Tech Corp. v. MPC Sols. Sales, LLC, 432 F.3d 797, 800 (7th Cir. 2005). The district court did not reach any final judgment as to the exemption, instead dismissing New Prime's motion to compel arbitration without prejudice and allowing for discovery on Oliveira's employment status. Oliveira v. New Prime, Inc., 141 F. Supp. 3d 125, 135 (D. Mass. 2015). As there has been no final judgment in the district court, I hesitate to resolve an issue that is not necessary to the disposition of this appeal. See Doe v. Cape Elizabeth Sch. Dist., 832 F.3d 69, 86 (1st Cir. 2016) (declining to address unnecessary

issue and deeming it prudent to allow district court to make determination in the first instance). And it is indeed unnecessary to determine the scope of the exemption at this time. If the case were remanded to the district court for discovery, the court might well rule that the nominally independent-contractor agreements between Oliveira and New Prime actually created an employer-employee relationship. In that circumstance, neither we nor the district court would have any occasion to categorically decide whether all transportation-worker agreements purporting to create independent-contractor relationships qualify for the § 1 exemption.

I am particularly reluctant to unnecessarily resolve an issue on an interlocutory appeal when, as is the case here, a number of factors counsel against doing so. Most fundamentally, deciding whether "contracts of employment" includes all transportation-worker agreements presents a challenging question of statutory interpretation. The statute itself provides little guidance. Further, as the majority notes, most courts that have considered independent-contractor agreements in the § 1 context have concluded that the exemption does not apply, and no other court has engaged in the kind of detailed analysis of ordinary meaning that characterizes the majority's opinion. We therefore have neither an example to guide and corroborate our analysis nor a contrary opinion to provide counterbalance.

Moreover, applying § 1 in this case requires venturing into the fact-bound, and notoriously precarious, field of employment-status determinations. Although the majority's categorical rule would eliminate the need for fact-finding on status, it could also lead to the over- and under-inclusiveness concerns typical of such rules. As Justice Rutledge observed in NLRB v. Hearst Publications, 322 U.S. 111 (1944): "Few problems in the law have given greater variety of application and conflict in results than the cases arising in the borderland between what is clearly an employer-employee relationship and what is clearly one of independent entrepreneurial dealing." Id. at 121 (subsequent history omitted). The doctrinal line separating employee from independent contractor is difficult to discern in the context of vicarious liability. See id. "It becomes more [difficult] when the field is expanded to include all of the possible applications of the distinction." Id. We find ourselves confronted by one of those "possible applications," making the issue before us all the more challenging. See Mandel v. Boston Phoenix, Inc., 456 F.3d 198, 206-07 (1st Cir. 2006) (vacating and remanding summary judgment order where, inter alia, there was little on-point federal or state case law and pertinent determination was fact-intensive).

Not only do we face a hard question — given that the contemporary meaning of § 1's language may differ from its meaning

when adopted — but we do so without the aid of a well-developed district court record.  Before the district court, the parties provided little briefing on the ordinary meaning of "contracts of employment" as of 1925.  Oliveira initially argued that he was an employee of New Prime.  He first briefed an ordinary-meaning argument in a short supplemental surreply submitted to the district court after a hearing on the motion to compel arbitration.  Oliveira cited just two sources from the time of adoption.  In a subsequent supplemental surreply, New Prime declined to address the ordinary-meaning issue head-on, instead only reiterating that the matter was for the arbitrator.  The district court's order reflects this dearth of briefing.  Rather than directly addressing the less-than-robust argument Oliveira raised in his supplemental brief, the court noted the extensive contrary case law and permitted discovery to resolve the case.  See Oliveira, 141 F. Supp. 3d at 130-31, 135.  When the ordinary-meaning issue reached this court, the record accordingly provided little guidance.  See United States v. Clark, 445 U.S. 23, 38 (1980) (Rehnquist, J., dissenting) (recognizing usefulness of lower court opinions); Cape Elizabeth Sch. Dist., 832 F.3d at 84-85 (choosing not to decide unnecessary question where parties gave "scant attention" to issue in lower court).

The briefing before this court was also less than ideal. Although Oliveira devoted significant effort to arguing that the

ordinary meaning of "contracts of employment" in 1925 included contracts with independent contractors, New Prime barely addressed the matter. It did not mention the ordinary-meaning argument in its opening brief, and spent only a page on the topic in its reply brief. At oral argument, New Prime merely insisted that ordinary-meaning analysis is inappropriate in the § 1 context. Where a court has the discretion to decide an issue, it should be wary of acting without the benefit of fully developed arguments on both sides. That is especially the case when we rule against the party with the less-developed argument.

Just as we have been presented with a one-sided view of the ordinary meaning of "contracts of employment," we have received a one-sided view of the facts. This appeal was taken early in the litigation between the parties, prior to any discovery that would have shed greater light on the facts underlying the dispute. The current factual record contains only Oliveira's unanswered complaint and some documents attached to the parties' motions. While the court is entitled to base its analysis on allegations in the complaint, Gove v. Career Sys. Dev. Corp., 689 F.3d 1, 2 (1st Cir. 2012), we should exercise added caution in denying affirmative relief to a defendant when our view of the facts is informed largely by the plaintiff's untested allegations.

Under these circumstances, our best option is to remand the § 1 exemption question to the district court so that discovery

may proceed and the court may reach a final decision.  If either party were to appeal any subsequent final decision of the district court, we would have the benefit of a better-developed factual record, more-focused briefing from both parties, and additional district court analysis.  See Denmark v. Liberty Life Assur. Co. of Boston, 566 F.3d 1, 12 (1st Cir. 2009) (Lipez, J., concurring) (expressing concern over dicta in majority opinion "fashioned without the benefit of district court analysis or briefing by the parties").

The majority has done an impressive job of marshalling the arguments in support of its interpretation of § 1.  I dissent not to take issue with the court's reasoning but merely to express my view that we would be better served in following a more cautious path.